Your Honor, the first case on the docket this morning is 2-24-0539 Scott Tollaksen v. William Stunkard Mr. Ken Lampart, Mr. Thomas A. Christensen Good morning, Your Honors. May it please the Court. I'm Brian Bosch. Seated at counsel's table with me is my partner, Tony de Blasio, and Mr. Bob Black, our appellate counsel in this matter. We represent Scott Tollaksen, the underlying plaintiff and appellate in this matter. I can start with a short recitation of the facts, but I know you've read the briefs. You have a bench memo. I'll open the questions if you wish to start there. Otherwise, I'm happy to give you a little history. While this dispute started in September of 2016, this matter actually goes back to 1999. In 1999, Mr. Tollaksen's own company, Tollaksen Company, where he employed two of the current defendants. He had employed them for several years. During that time, Mr. Tollaksen realized there was a business opportunity kind of adjacent to or supplementary to his current business. That's Lionheart Critical Power Specialist, which I'll just call critical, and the power entity power, as long as the Court is fine with that. So he incorporated critical. He is the person who created it, who funded it, and who made it possible for its first two, three, four years. What is the relevance of that? Well, to understand really what's going on. That's obviously in the record in the briefs, but what's the relevance of that to the buy-sell agreement that really is the big issue in this case? Well, in terms of understanding that, not necessarily. It's important to understand why we got to the buy-sell agreement and the attempt to shut Mr. Tollaksen out, and that's fine. The buy-sell agreement was entered into in 2006 and 2008 for the two companies. That's when they were entered into. In 2015, January 2015, there's a shareholder meeting for the two companies where all the shareholders are present, and not Mr. Tollaksen. Other shareholders voice concern about the fair market value versus the book value that's in those two agreements. The two agreements provide for, if there's a change in the ownership of shares by any of the shareholders, that would be net book value, which is significant less at that point in time and today, for critical at least, than the fair market value. That was not Mr. Tollaksen's doing. But that was never adopted. Well, it was. They discussed it, as I understand it, and people seemed to agree, but it wasn't changed in the bylaws. Am I right? Well, it's never been in the bylaws. It's only been in the buy-sell agreement itself. And the buy-sell agreement only requires a writing. A what? A writing. Nothing more. It doesn't have to say it has to be executed by anybody or anything. It just says a written documentation to change the agreement. The written documentation are the minutes. The minutes are very clear that, in fact, all five shareholders for both corporations agreed that the net book value valuation put on the corporations was to be changed to a fair market valuation. And so that actually is sufficient, given what the buy-sell agreements themselves require. Was that before or after Mr. Orsini was bought out? That was after Mr. Orsini was bought out, I believe. Yes, I believe Mr. Orsini was bought out. I may be wrong about that. We view Mr. Orsini's dealings as kind of a red herring in all of this. And I can understand that point of view. But from a historical perspective, it's something to note. True. Absolutely. It's part of the history of the case. There's no question about that. But what you have is, in 2016, you had the five shareholders in the two companies with an agreement. And the agreement says what the agreement says. You argue that the buy-sell agreement is a classic option contract requiring strict compliance. But where specifically in the agreements is the mechanism for exercising the option defined? Where is that in the agreement? Where is that in the buy-sell agreement? Yes. Certainly. I'd like to point something out. This is my mistake. In our brief, we say that the word option is used at least seven times in the two agreements. It's actually used ten. I went back and counted before we started. In each of the agreements, the word option is used ten times. So where you find this is in Section 2 and Section 3 of the agreements. And it starts with the first paragraph of Section 2. And it talks about the shareholder shall have the first option to purchase all the number of shares. That's right in the middle of Paragraph 1, about seven, eight lines down. Okay. In Paragraph 2, upon the happening of any of the following events, the other shareholder shall have the first option. Okay. And it talks about then the termination. Then you go, continue on to Section 2. In the next page of the agreement, it talks about the shareholder shall have the first option to purchase. Okay. This is a classic option agreement. It walks you right through the steps. What it says is if one of these are triggering events, and we don't believe truly a triggering event has occurred, but assuming for the sake of argument at this point in time, one did. Okay. It's very clear what happens. The shareholders who are not the shareholder who caused the triggering event have the option to purchase some or all of the other shareholders' shares. Okay. If they don't elect to purchase some or all of those shares, then the corporation has that right. And if the corporation doesn't purchase all of the shares, the agreement is very clear that then the shareholder whose shares are subject to the option retains those shares. This was something that Trump would have never seen. Or could sell them. I'm sorry? Or could sell them. Retains them and has the right to sell them to anyone at that point in time. There's no restriction now on the sale of those shares. So if he's let go and then he retains them, what is his position with the company? He's the shareholder. That's it. Well, we believe the termination was improper. Determination occurred. Whether it was proper or not is another question. They fired him on September 21st of 2016. So because they didn't accept the option appropriately, by the end of October of 2016, Mr. Tollefson was a shareholder in both corporations. The long and short of it is they can't, and the court is incorrect, and they can't force him to sell those shares to the other shareholders. Well, the only way that can be forced is if they appropriately accept the option and then exercise the option, right? Right, right. May I just want to kick with respect to your question about what was he after then? You also have to remember that despite the fact he was fired, and despite the fact that they said he had no shareholder rights after September 16th, and they rely on that, they cite the court below on that multiple times, Mr. Tollefson continued to be elected as an officer and director of the companies into 2017 and 18. So their own actions at the front end of this belie their actions and their positions taken in this litigation, okay? And one of our claims is that he's entitled to be compensated as he was before as an officer and director. So I'm sorry I cut your honor off, but I wanted to make that very clear. Let me ask this then. If Lionheart had sent the same September 23, 2016 letter and the redemption agreements without the restrictive covenants and requested relinquished estate in Lionheart Real Estate Partnership, would that have constituted a valid exercise of the option? In other words, if they remove the conditions and remove the Lionheart Real Estate Partnership condition, that would have been a valid exercise of the option, would it not? As long as it didn't conflict with what was in the option, that's correct. Because the option said book value. Well, the agreement said book value. Our position is that that was amended to fair market value. But let's just work off the idea it was book value. But the case in Illinois is pretty clear. The buy-sell agreement is fixed by its terms. And to amend it, the board of directors and the shareholders would have had to have a say. Right. And that occurred in January 2015 at a board meeting where the issue was brought up not by Mr. Tollison but by other shareholders in a written set of minutes for both corporations. Excuse me for interrupting, but I took the opportunity to look at the buy-sell agreement. Section 7 says written agreement. To me, that means it's written down and we all sign it. Well, then I think we have an ambiguity as to what a written agreement means. I think the fact that you memorialize it in the minutes of a meeting where all five shareholders are present for both corporations, that's a written agreement. Doesn't a minute say that, Dave? Yes. What do the minutes say for the exact language of it? Yeah, I have to admit I thought it said something like there was general agreement or... Well, there's general agreement to change the term from net book value to fair market value. I think there's also an argument the plain language might answer it. Well, maybe so. May I ask a question? Absolutely. If we found that the option failed to honor the mirror image rule and was ineffective or, excuse me, I guess the purported option, and so therefore it was ineffective, what's the remedy for that? You're asking us to reverse that summary judgment in their favor. Is there any reason we shouldn't give summary judgment on your cross motion? That's what we're asking for. That's our first relief that we're requesting. Was there any post-exercise behavior that would have indicated arguably a waiver or a stop on your client or some sort of course of dealing? Quite to the contrary. It was rejected in correspondence between counsel in October. Blindheart counsel at that point in time who was representing everyone at that point in time sent a letter in December saying, by the way, we want you to come forward and tender your shares so we can pay you. In January of 2016, they sent another letter, the same thing. It was clear that Scott said, no, you made me a counteroffer. Here's my response to your counteroffer. Pay me fair market value. Right. And there was never an agreement to that point. On that, talking about that, your client refused to surrender his shares after he received the letter. And you're arguing in your brief that the restrictive covenants were one of the reasons why he rejected. But did he bring those concerns to Lionheart's attention at the time? Yes, but the main issue. Answer my question. Yes. Yes. When? I believe it's. I'm sorry. We're in the record. I believe it is. I don't know if it's in the record. It's not. I know counsel argued it in the motion during the motions on cross motions for summary judgment. That argument was made. But when did your client ever bring it up? In October of 2016, his then counsel wrote back and engaged in starting to negotiate with them. But it was right from the start. There was never any hesitation on Mr. Tollefson's part to say, I'm not accepting this, okay? I'm not accepting the restrictive covenants. I'm not accepting the non-solicitation agreement. I'm not accepting the indemnification provision. I'm not accepting the demand that I give up 20 percent of an entity that owns the property on which Critical operates. Another $150,000 to $200,000 value. All those things were asked and demanded of Mr. Tollefson without any consideration. If you look at the agreement, the agreement only says, we're going to pay you your net book value. That's it. And then on top of that, we're going to ask for those four things among other things. But very real significant things. And the case was very clear. An indemnification agreement is enough to void or to turn an attempt to accept an offer into a counteroffer. Just that one provision alone was enough. Putting aside the restrictive covenant, putting aside the non-solicitation agreement, putting aside the attempt to take a 20 percent interest in a piece of real estate in which none of the parties have brought into the case. We attempted to do that in our amended complaint, given the circumstances. Counsel flagged that that was going to be a problem in the correspondence to Mr. Stunkard, right? That the real estate was going to present a problem. Absolutely. And Mr. Stunkard said something to the effect that, well, I understand it's very disappointing, right? Because Mr. Stunkard thought, we can just take that along with everything else. That's in the August of 2016 conversation with his then counsel, Huck Bomo. Okay. And just so the Court is clear, part of the reason we have this correspondence involving counsel is there was a third party, the consulting agreement or consultant, Evans and advisors, who was looped in on these. And we actually got all this information, not from the defendants, but from Evans and advisors. They're the ones who produced it to us. Okay. So that's why you see what otherwise you might think would have been privileged communications showing up in the record. What damages were you seeking against the corporations? Against the corporations? Yeah. I saw the rent and you've acknowledged, okay, they're not parties and explained why. Right. The way the complaint that's originally filed is structured. You can continue. Okay. It's structured. It's based on the Business Corporation Act. It's not brought as a derivative claim or an individual claim. It's all based on the Business Corporation Act. One of the things that is unrefuted is our expert testimony that Mr. Tolleson is entitled to at least $1.2 million in dividends from September of 2016 to 2024. That number has increased because he continues to be a shareholder and he still doesn't get dividends. And may I ask, and excuse me if the record should have revealed this to me, but is that predicated on the notion that, you know, I picked up that you claim the officers are overpaid in terms of their salary. I don't think I read the corporation ever gave dividends. They never did. So that, you know, the idea being that whatever the dividends of the corporation would have been was actually just given as salaries to the employees. Right. In fact, in our reply brief, we cite two Wall Review articles from Loyola indicating that, in fact, this is oppression. And the reason this happened this way is this is not a subchapter S corporation where everything passed through. For whatever reason, it was set up as a C corp. So if you take and hold any money and then distribute it as dividends at the end of the year, it gets taxed twice. It gets taxed at the corporate level and then it gets taxed at the individual level. What they were doing, which is perfectly legal, I'm not suggesting there's anything wrong with what they did. Corporations do this all the time. Rather than having a bundle of cash at the end of the year, and Critical was generating a tremendous amount of cash, they would take it out as salary so at the end of the year there was nothing left to tax at Critical. And the agreement was, all the way through to September 2016, was that because Mr. Tollison had another business but created the companies, set them up, brought all four of them in, that Mr. Tollison would receive 80% of the compensation that the other four individuals did. And that held true until his termination. But they did not compensate him in any way, shape, or form as an officer and director, which they kept him as after he'd been terminated. Does it matter that, I didn't see in the record that the directors were paid for that capacity. They were paid as employees as I understood it. Does that matter? It does because tax returns shows them as officers and directors. They're separately scheduled on the tax returns. I'm sorry, I don't know the schedule number, but it is in the record. It's a letter, I believe. Anyway, it shows all five of them as officers and directors. It shows the total compensation, and if you do the math, Scott made 80% of what the other four made. And he was continued to be listed as a shareholder in the corporation through 2022. We didn't get any tax returns after 2022. But through 2022, he appeared in that schedule every single year. Some of those years, of course, his compensation was zero, but he appeared. They scheduled him. Excuse me, just to make it clear in my mind. I guess what I hear you saying is they were never paid as employees of the corporation. They were paid as officers and directors. Yeah, it's a closely held corporation. I'm not sure exactly. They won't let us see the books. Mr. Collison didn't keep the books. Mr. Stunkard kept the books. He's not even here in the local area. But they were compensated. All of it was reported. All their compensation was reported on that schedule as officers and directors. So it was all wages. Let me ask you this. The trial court never really dealt with the argument that these conditions make the buy-sell agreements or the redemption agreement a counteroffer, right? The trial court really never dealt with that. He did in the sense that he said it doesn't matter because his position was the buy-sell agreements required Mr. Collison to sell his shares. Right. He basically didn't discuss the impact of those additional conditions. No, because he didn't think they mattered.  Let me ask this. Section 10 of the buy-sell agreements provides that, quote, each party to this agreement agrees to perform any further acts to execute and deliver any documents which may be reasonably necessary to carry out the provisions of this agreement. And I understand that the defendants haven't really argued this. But we could affirm on any basis supported by the record. It's traditional in the start-up of a company where you put these types of covenants in because the board still has a fiduciary obligation independently and as a corporation to protect the corporation. Isn't that really what they were attempting to do is to protect the company? No, I would suggest to you that Mr. Stunkard and Mr. Ritter were trying to steal Mr. Collison's shares cheaply. Well, that's your interpretation. Well, that's what their e-mail said. That's what their December 15 e-mail says. We would expect them to agree. But that's their e-mail. That's what their e-mail says. We're going to end up with Mr. Stunkard owning 80 percent of Power, which in retrospect would have been an awful deal since Power was closed. And Mr. Ritter's going to own 80 percent of Critical. And the way we're going to do this is we're going to force Scott to sell his shares cheap. Then we're going to go after Mr. Hunter. And we're going to give him a spit because we kind of like him. Kind of a Hunger Games style, just keep reducing it down. Absolutely. And the goal was that Mr. Stunkard was going to own 80 percent of Power. Mr. Ritter was going to own 80 percent of Critical. And, of course, they started to execute that in September. They just did it wrong, okay? I mean, we can put aside motivation and just simply look at the actions that occurred here, right? And, again, in August of 2015, Huck Bohm, again, who was representing the corporations and the shareholders, wrote to Mr. Stunkard. There's a letter in the record that says if you're going to do this, you need to have a meeting of the board of directors, either in person or by special meeting, to approve this. And the record is clear. It never happened, okay? So before you even get to whether or not they did it appropriately, they didn't have the authorization to do it. And their own counsel told them that. The argument that they make in their response, well, we have the right under the Corporation Act to buy back our shares. We don't contest that. That's always been the rule. The question is, how do you do it? What's the mechanism? The board never voted on it. And the board, neither the company ever voted on it. The shareholders never voted on it. They profited from you, and they say in their own waiver, look, it is in our best interest to have the company purchase the shares, to use corporation money. Why? Because they're getting $1.2 million of value that they don't have to part a cent with. They get Mr. Tollison's 20% interest, 5% each of them, right? And they don't have to spend a penny of their own after-tax money. They do it off the corporation. Thank you so much. Thank you, Your Honor. And you will have an opportunity for rebuttal. Thank you. Okay, thank you. Ms. Rothenbach? How do you pronounce it? Kowalski. Oh, I'm sorry. I'm looking at the wrong thing. Okay. Thank you. And we'll give you some extra time, as you see Mr. Bosch used up some extra time, so if you need it, certainly you can have that. You may proceed, Your Honor. Good morning, Your Honors. May it please the Court. My name is Stephanie Kowalski, and I represent the Apple League corporate defendants. With me at the counsel table is Kevin Lyons, who also represents the corporate defendants. I'll refer to them as the LH entities, which is the corporations. Mr. Christensen represents the four individuals, and he'll be arguing on their behalf, and we'll adopt and incorporate any arguments that apply to both. You just heard Mr. Tollison's counsel give you five reasons that the buy-sell agreement that Mr. Tollison signed back in 2006 and 2008 shouldn't be enforced as to him, even though he enforced it as to Scott Orsini. He claims that the buy-sell agreements are ambiguous. They're not. He claims that they were amended. They were not. He claims they're option contracts. They're not. He claims that the exercise of the option was a counteroffer. It was not. He claims that the exercise was ultra viris. That was the last argument that was made. It was not. If you honestly would like me to address those in any particular order, I'm happy to do that. Otherwise, I'll just go in order. So the first option was to other shareholders, right? Correct. So upon a triggering event, which was the termination, the first option goes to the shareholders. The shareholders waived their option, and then the companies exercised their option. But there was no meeting. The board never approved it. The shareholders never approved it. It's the buy-sell agreement itself. They waived the first option, but there was no meeting to approve the corporations. There is nothing in the buy-sell agreement that requires a meeting to be held. The authority to exercise that option by the corporations flows from the agreement itself that was executed by the shareholders when they signed it, and by the corporation itself. So the authority flows directly from the buy-sell agreement itself. And there's nothing in the Business Corporation Act that requires a board meeting or board approval for the redemption to be exercised in this case. As to Tollefson's ambiguity argument, the recitals in the buy-sell agreement are clear. All of the shareholders are employees of the corporation. Section 2.2b states that upon a triggering event, such as the termination of a shareholder's employment in the company, the buy-out mechanism is triggered. Now, in critical's buy-sell agreement, there's a bold parenthetical that says, this provision shall apply to Tollefson, who's an employee of the corporation. And Tollefson, in his deposition, testified that he knew he was an employee. He knew that he could— It's really, I think you make the argument, or no, the other side, excuse me, but they make the argument that what his thinking about the agreement was is irrelevant. Isn't the interpretation of the contract a matter of law? It is, Your Honor. It's just it shows the intent of the parties and the course of conduct. He knew and acknowledged— Which we would certainly get into if it were the agreement were ambiguous. But you contend it is not. It is not, and we don't need to consider that. It just shows that he knew what he signed. As to voluntary versus involuntary, the agreement is clear that it's the termination of employment that's the trigger. And Illinois courts have enforced similar language where it's, for example, in ICD publications, the Gitlets, it's 2014, 1st, 133277. A buyout option was triggered when any employee ceases to be an employee of the company, whether voluntarily or involuntarily. That's typical language in these types of buy-sell agreements. Let me ask this. Would you agree that uninterpretation of Lionheart's purported acceptance of the option to buy is de novo? Correct? Our review is de novo? Your review is de novo because it was granted on summary judgment, so that's correct. Let me ask you this. Would you agree that this is basically black-letter law in the state of Illinois? It's well settled that in order to constitute a contract by offering acceptance, the acceptance must conform exactly to the offer. Under Illinois contract law, an acceptance requiring any modification or change in terms constitutes a rejection of the original offer and becomes a counteroffer that must be accepted by the original offeror before there's a valid contract. That would be the case if Your Honor construes the buy-sell agreement to be an option contract, which our position is it's not. It's a binding agreement that it contains an option, but those options were granted when these agreements were signed back in 2006 and 2008. Say that again? The options were granted? The options were granted to the corporations and the shareholders at the time that the agreements were signed because they're in. But the purported redemption agreement contained additional conditions that were not in the buy-sell agreement. The companies exercised the options that they had in the buy-sell agreement in the September 21, 2016, letter. The letter is clear. It states that the corporations are purchasing his shares. It states that the shareholders waived, and it sets forth the purchase price. That's the net worth value. I understand that. The additional conditions require resign from all director and officer positions, agree to a two-year restrictive covenants. I'm summarizing. Acknowledge that Lionheart had required plaintiffs to make covenants as a condition of their obligations to consummate the transactions. How are those not additional terms to the redemption agreement? How do you – we'll split that and say they aren't. Right. There's nothing in that September letter that conditions the exercise and the buyout by the corporations on Tollefson executing those documents. The language in the letter simply says, quote, we request Mr. Tollefson execute and return these documents. There's nothing that says that if he doesn't, the companies won't buy his shares. And Your Honor had brought up Section 10, the Further Acts provision. That's exactly what this is. And documents that constitute a standard closing procedure do not offer equal account offer under Illinois law. It's still a valid exercise of the options, and it's not defeated by a request for ministerial documents, which is what this was. Under Wrencher v. Busby, which is 98 OEP 3rd, 775 1st District, 1981, the 1st District said, quote, the act of executing the contract was regarded as a ministerial act. So even if – Executing the contract is one thing, but layering on a non-compete, indemnification, and, you know, the other items in your exercise of the option, it seems to me quite different. Well, I – so the law is clear, and it shows that if the exercise is clear, which in this case it is, because it says we're buying his shares, it sets forth the purchase price in accordance with Section 3 of the agreement. And there's nothing conditioning that purchase, that redemption of his shares, to him executing those redemption agreements. There's nothing that says our exercise is made conditional upon you executing the redemption agreements and the other documents that would consummate the transaction in accordance with Section 10. So the letter really said, we're exercising our option. We would also love it if you would, you know, agree not to compete, indemnify us, and all those other things. But according to you, it was clear that those were just requests that wasn't part of the exercise of the option. Correct. It did not condition the exercise of the option on his acceptance of those additional – his execution of those ministerial documents that would just wrap up the transaction. Well, say that occurred, and then he went out, and he started to compete. Would we be here on a different issue today? Well, if he tendered his shares, then he would no longer be a shareholder. Right. If he started competing and using confidential information, then we would probably be – We're not talking about confidential information. He's going to start competing, because you said he didn't have to agree to that in the letter. Correct? Yes. There wouldn't be anything prohibiting him contractually from competing. Okay. This issue was never tried, right? I mean, the court just brushed it aside, the trial court. The trial court did not consider the buy-sell agreement to be an option contract. He considered it a binding share – basically a shareholder agreement that was triggered upon Tollison's termination, and Tollison was required to follow its terms. If, as you suggest, that these are – you know, these were not important, Section 6-2 of the Redemption Agreement states, this agreement, quote – or, friends, including the documents referred to in this agreement, constitutes the entire agreement among the parties, contains all agreements among the parties with respect to the subject matter, and supersedes any prior understandings, agreements, or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter. So your own language on this Redemption Agreement shows that it's separate. It's new. Well, no, I would argue that that's – What's the superseding – and that was the same language in the Orsini agreement. His restrictive covenant was only 12 months instead of 2 years, but it's pretty much identical. I would argue that that was simply a ministerial act, and obviously in all of these transactions, whether it's a redemption or it's a cross-purchase between shareholders or a redemption by the corporation, that's language that wraps everything up so that at the end of the day, there's no misunderstandings. But our position is that that wasn't required because the companies properly exercised their options, and the power comes from the by-sale agreement itself. I'm going to take you to a different section. We didn't get there yet. But the denial of leave to amend by the plaintiff, the court's ruling on that. Under 2616, you can amend any time before defining judgment. How is the court's ruling correct in that denial? So that argument is actually going to be addressed by Mr. Christensen, but I can give you my answer. I don't want you to steal Mr. Christensen's thunder. His thunder, right, right. Okay, anything further from either? So we just ask that the court affirm all of the orders that are at issue in this case. Thank you. Okay. All right. Mr. Christensen. Thank you. May it please the court, my name is Tom Christensen. I represent the individual defendants. It's kind of hard to go third because everything's already sort of been flushed out, but I do want to come back to the letter of September 23, 2016. Your position is that that was sufficient exercise Lionheart's option. Well, here's what I want to point out. Because that letter, which happens to have my name on it, is in two very distinct parts. And if you read it carefully, what you will see on the second page is a paragraph, the fourth from last paragraph is the paragraph that talks about the corporation's redemption of the shares. Okay. And what that says is, it states the purchase price and it says, we anticipate closing on the purchase via a single lump sum payment on the completion of the transfer of the shares back to the corporations, period. That is a direct exercise of the rights. It's then followed by, we request. We request. And as Attorney Krupalski indicated, nowhere is it conditioned upon those things. It doesn't say only if you... It's only true as a request. It wouldn't have been a contract because what would have been the consideration? That's... Just a gift. I'm going to give up my right to compete. I'm going to indemnify you for the joy of it because of our many happy years together. We have Section 10 of the BICEL agreements, which says we can ask for, you know, other ancillary documents. Ancillary documents. And that includes a restrictive covenant. Again, it's a mere request in that letter. It is... Nowhere does it condition. So he could have easily said... I'm just reading the contract as a whole, not in pieces. He could have easily said, I'm going to perform that part of it, in which you say that you'll pay me upon the return of the shares. If you didn't like the net book value, there's a process for that. But he could have simply said, here you go. Here's the shares. I'm not signing any of that. And you don't have any contractual ability under the BICEL agreements to cause me to. That's why you called it a request. So, yeah, I mean, he didn't do it, so we don't know how it would have played out. But nowhere is that conditioned or made a part of our... of the corporation's statement that he's going to purchase his shares at net book value. That is a distinct part of this agreement, followed by two requests. Could have said no. Could have said that's not part of what I want to do. You just threw that out there, her chances. Of course it would have been to the benefit. I mean, I'm not saying that we didn't want those things. But I think by using the term request, we effectively acknowledged that he wasn't obligated to do it. And he could have said no. He can't use that as a way to evade the basic obligation under the BICEL to sell for net book value. Because that's what was exercised in that first paragraph. And then he was perfectly free to say those other things you're asking for, those are not part of what's contained in the BICEL agreements. I'm not doing that. Thank you for the request. I choose not to. There are ways that he might have been benefiting from those other things, having a specific decision. I mean, I'm not buying what you're just arguing right now. Because it's, you know, you never make reference to section 10 in paragraph 4, post-closing covenants. And the section 4.1 then goes to 4.2. It's clear that in order to consummate the transaction, he was required to sign this, to sign off on the covenants. That is ridiculous to argue otherwise. Because it would be an amendment to the agreement. If he had signed it. He did sign it.  And he was, why was he required to sign it? What is Illinois, the rule in Illinois with respect to the mirror image? I don't think he was required to sign the redemption agreement or any of those other documents. He had no obligation to do that. That's why we use the word request. We didn't say to him, as you know, may request. It says may request. And then there's nothing about requesting in paragraph 4.2. Right. I mean, absolutely. But, again, that's why he was free to say, I don't view that as part of my contractual obligation. Mr. Christensen, let's talk again before you go, because it's your section about the denial of leave to amend. Yeah. I mean, broad discretion, obviously, is offered to the trial court in this matter. Well, isn't the law that it's any time before final judgment? Yeah, but there are some limiting principles on that. Well, there are, in order for the court to evaluate, there are four principles that the court should go through. Did the court make this evaluation before he ruled on the denial? No, I believe that. So I think what we're talking about here is futility. And what was argued in the response to the corporation's response to the motion for leave to amend was primarily that the amendment would be futile because of all the things that we're talking about, all the positions that we take regarding the fact that he had no remaining right to any distributions or anything like that. Therefore, the amendment we argued in the trial court was futile. I don't believe that the motions for summary judgment had been ruled upon at that point. In fact, I know they had not. And I can understand that from your point of view if you win on the alleged mirror image problem. Right, right. Yeah, the futility is tied in. But either way, how would a shareholder in the corporation that owned the real estate have gotten relief from the corporation, you know, Lionheart, gotten relief from Lionheart for rent of its premises without adding the corporations that own the land? How would they ever have gotten that relief? Either a separate lawsuit or included in the initial pleading sometime before six years into the litigation. Maybe that's what they're trying to do. Well, but again, it's six years into this litigation where we're adding a new party and new claims, which is, you know, just manifestly disruptive and dilatory with respect to the process of the litigation and the trial court's management of that case as it proceeds to trial. Where was the prejudice or surprise? The case was not set for trial, and these subjects were all brought up during a mediation. I mean, fact discovery was closed. We had taken all the depositions. We went from a 17-page complaint to a 17-page complaint. Brand-new claims, brand-new factual allegations. At a minimum, the plaintiff would have had to be redeposed. Presumably there would have been other depositions that would have needed to be taken. But ownership of that land and the shares in the corporation wouldn't have been a real big deal factually, would it have? You know. Maybe, maybe not. Can I ask, did the expert the plaintiff referred to speak to the issue, what the fair market value of the rent? To my recollection, Your Honor, his only opinions were about the compensation. Thank you. So we just feel like this far into the litigation, under the timeliness requirement, under the, you know, the massive expansion of what the case was really about. But you don't deny that the trial court never weighed any of these factors. I would agree with you, Your Honor, that he primarily looked at futility. So, I mean, to Justice Mullin's point, if those things are, I must concede, are connected, because the focus at that point was on futility, because I believe the trial court had already made certain conclusions about the merits of the, on the redemption. Thank you. Anything further? Yeah, I want to go back to something you argued, that this was not, these conditions did not affect the proper exercise of the option. Subsection E states, and this is a. . . I'm sorry, Judge, which document are you reading from? This is from the purported redemption agreement that was never signed, Section 4. If you go down to Section E, shareholder understands that the purporting restrictions may limit his ability to earn a livelihood, et cetera. It goes on. That makes clear that he recognizes that by signing this agreement, it may affect his ability to earn a livelihood, but he's accepting it. That's a CYA for the corporation for future litigation, correct? I respectfully, Your Honor, he wasn't forced to sign it. We did not contend. . . He didn't sign it. We never said in this, in the letter of September 23, 2016, that the only condition upon. . . Your Honor, use the term conditions. They are not conditions. I understand Justice Mullins' point where are we requesting it, you know, just to be nice. Sort of, yeah. Okay. We're free to say. . . Absolutely. You're saying that now. . . We had to. This argument wasn't made in the trial court. We didn't get that far. I should have gotten that far. Because it was brought up by the plaintiff, and it was never properly addressed by either you or the trial court. All I can say is that we would have had to perform the redemption, even if he had said, I'm not signing those other documents. They are termed as requests, requests only, not conditions, in the September 23 letter. That's an important difference. It could have been worded much differently to say, here are the conditions under which we will redeem your shares under the terms of the buy-sell. He could have said, what are you talking about? None of that is in the buy-sell. That is not what we said. We said, here's what we'll do. Here's the price. And we anticipate closing on the purchase via a lump sum purchase. And then we go on to say, in this regard, we request you sign this, we request you sign that. Two totally different things, respectfully, Your Honor. Thank you, sir. Thank you. Mr. Bosch, your rebuttal. I'd like to start with two really important observations of what's occurred here today. Ms. Kopalski tells you it's not an option contract. But time and time and time again, she refers to it as an option contract. She can't have it both ways. She can't tell you it's not an option contract and then argue it's not. Or that it's not and then say, it's an option contract. If you look at the record, I bet she said it at least ten times in the course of her argument. It's an option contract. As opposed to, with respect to these agreements that were attached. Our line counsel, down on December 23, 2016, at C-325 of the record, Mr. Christensen writes a letter to Mr. Tollinson's counsel, dated September 23, 2016. It's the second paragraph. In light of the foregoing, the companies have instructed me to proceed with the redemption of the net book value for the agreements. Accordingly, demand is made upon Mr. Tollinson to surrender his sheriff's certificates for which he will be paid in the sums that are in it, in lump sum payments of certified funds. The paragraph closes. We previously sent you the redemption agreements. Don't tell me the redemption agreements are meaningless. And Mr. Christensen turns the entire acceptance process upside down in his argument. It is not for Mr. Tollinson to say, well, you know what, whatever you told me, I just don't like those things. I'll accept the rest of it and we'll go ahead and consider that an acceptance of the option. It's not for Mr. Tollinson to say no. It's for Lionheart or the shareholders to say yes. And for them to say yes in exactly the terms set forth in the option. Nothing more. But they were negotiations, right? That's a negotiation. As the trial court said, they were trying to get a better deal. That's all this was, was an attempt to get a better deal. And it was reiterated in December of 2016 by Mr. Christensen himself. So to say that it's Scott, it's Scott's fault because he didn't say no and say, oh, by the way, I'll go ahead and then let you exercise. No, that's not how it works. We have over 125 years of law. Unbroken law from the Supreme Court as applied by various appellate courts that says you must meet the terms exactly. The Epton case, they like to say, well, we don't have any shareholder cases. It's all about options for land or wheat or lard from 1895. The Epton case involved the shares of the White Sox. The person who was attempting to accept the shares gave an oral acceptance. The document said it must be in writing. The first district said it didn't do it correctly. They don't have to accept your, they don't have to tender the shares because you gave an oral acceptance when the agreement says it must be in writing. Now, how much more fine can you cut that? It didn't say that the acceptance was different from the terms. It said it was simply an oral acceptance not written. If that's not sufficient, then all these additional terms certainly aren't sufficient. With respect to where we were on the amended pleadings, Mr. Christensen is wrong. Fact discovery was not closed. They say that. It's not the case. Let's quickly walk through what happened. There was a motion for summary judgment filed. Then there were party discoveries. And then in November of 2022, we filed our response. January of 2023, I believe I have the years right, they filed their reply. The parties then engaged in some negotiation. Lionheart withdraws its motion for summary judgment. We did not have one pending at the time. With prejudice, we were going for mediation. We mediated in April. You agreed to forgive them for that, you know. No, no, no. In December, we agreed to reset. I'm not suggesting that there's anything unfair that's going on. But let's be clear on what happened and the order in which it happened, okay? In April of 23, we went to mediation. We came back to the court in May and said, Judge, we want to amend our pleadings. At that point in time, we still wanted to amend our answer to the counterclaim and our complaint. In June and July, we filed our amended pleadings. At that point in time, discovery was still going on. In fact, we conducted depositions thereafter. That discovery was open. We even offered to the judge that if they wanted to re-depose Mr. Tollex on unlimited issues, they could have him. We told them that. That discovery didn't close until December of 2023 with the proviso that if you have something, you can still continue on, okay? So to say that that discovery was closed is incorrect. And with respect to the last of it, well, the first prong of loyal, if I may, there is no defective pleading to cure. And it's very clear from the Roush case from 2010 that, I'm sorry, not the Roush case. The consideration here is whether or not the underlying complaint was defective. There was no defective pleading. So the first prong of loyal doesn't apply. There's no surprise. There's no delay. Because we didn't know some of these things until discovery started. For instance, we didn't know until January of 2017 when the complaint was filed that they weren't going to pay him for continuing to serve as an officer or director. They weren't going to continue to pay or give him dividends. None of that was known. January 31st of the year in for critical, we filed on January 17th of 2017. So none of that was known at the time of the filing of the complaint. It was all through discovery. We acted as expeditiously as you could after that. Thank you. Thank you, sir. Thank you so much for your arguments today. We will take the arguments that were produced under consideration when we make a decision in due course. Court is in recess until our next oral argument. Thank you, sir. Safe travels back, folks.